International Prisoner Transfer Unit. Ms. Rio for the amicus curiae, Ms. Lyons for the accolade. Good morning. Good morning, Your Honor. Erica Hashimoto, court-appointed amicus. With the court's permission, Dominique Rio will be, Student Council will be arguing the case for amicus. Thank you. May it please the court. This case is simply about holding the government to its commitment. In Article 3, Section 6 of the U.S.-Canada Treaty, the United States agreed to consider the best interests of prisoners when making transfer decisions. This commitment is important because it is not an intuitive one. Usually, the government wouldn't have to consider the prisoners' best interests when transferring prisoners within the United States or with other countries. But Article 3, Section 6 of the U.S.-Canada Treaty expressly requires the United States to consider the prisoners' best interests. The mandatory language in Section 6 provides a manageable standard for judicial review. Courts can look to ensure whether the government did, in fact, consider best interests when making the transfer decision. Without any judicial review, the IPTU's compliance with the treaty would rest in its hands alone, which the Supreme Court warned against in the unanimous decision in mock mining. Indeed, Section 6 is the only provision in the treaty that serves to accomplish a primary purpose of the U.S.-Canada Treaty, which is the social rehabilitation of the prisoner. So do you think we need to address at the outset whether this provision of the treaty is self-executing? Yes, Your Honor. We argue that the provision is self-executing, and this court can address that question if it wants to. It wasn't raised in the district court below, and because it's not a jurisdictional question, the court doesn't have to address the question of self-execution. Why don't you think it's jurisdictional? Because in Yogi, the court differentiated the question, said that in Yogi, the complaint claimed a violation of a treaty, and it said that even if there was no valid cause of action under that complaint, there was still a jurisdiction for the court to hear the case under 28 U.S.C. 1331, and said that yes, there's jurisdiction for cases arising under the Constitution, laws, or treaties of the United States. So it is a separate question from whether or not there's jurisdiction. It's not a jurisdiction. So to determine whether it's arising under the treaty, isn't that tied up in the question of whether the treaty is self-executing? Because we have to, in order to conclude that it arises under the treaty, we have to assume or conclude that the treaty is self-executing so that it can arise under it. Yes, Your Honor. And so because it wasn't raised before the district court, this court can assume without deciding that the treaty provision is self-executing, or it could reach the issue of self-execution on appeal, and the provision, we argue, is self-executing. Medellin says that the first thing this court should look to is the text of the provision, and this provision has mandatory language. It says that the government shall consider the best interests, which is very different from the provision in Medellin. Also, the provision in Medellin that was considered non-self-executing had an alternative enforcement mechanism. The Article 94 of the UN Charter expressly tells the parties that if there's a problem, they should go to the ICJ, and there's no alternative enforcement mechanism in Section 6 or in the treaty as a whole. And also the fact that the language of Section 6 is protecting individual rights, it's talking about, it's making sure that the parties are considering the best interests of the prisoner, is another indication that this is a self-executing provision. So can I go back for just one second to the question of not whether it's self-executing, but whether we have to determine whether it's self-executing? And on that, Yogi says what it says. It's not from our court, so we're not necessarily bound by it. And if we're addressing the question in the first instance, I think there's cases that come out the other way and say that whether a treaty is self-executing is a jurisdictional question. So what's the argument for why it's not, given that the consequence of saying what's at stake in determining whether a treaty provision is self-executing is whether Congress intended to have any operative law at all, which kind of makes it seem like it's a fairly threshold consequential question about whether there's any law to be applied here. It is, Your Honor. And so this court certainly can reach the question of self-execution. We just used Yogi to say that there is room for this court to assume without deciding that the provision is self-executing, and remand to the district court reversing on the fact that there is a manageable standard for judicial review, assuming without deciding that the provision is self-executing, and allow the district court to hear the question of self-execution for the first time on remand, since this hasn't been brought up before. This hasn't been brought up in four years of litigation. But if this court wants to reach the question of self-execution... So I guess what I'm asking is maybe even more antecedent to that, which is whether I have to reach it. Because let's just assume, I'm not saying this is right, but let's just assume my view is that I'd rather not discuss whether it's self-executing, but if I have to, of course I have to. Right. And it sounds like your position is that I don't have to. That's correct, Your Honor. I'm just wondering why that is the case, given that the consequence of determining whether something is self-executing or not is whether there's operative law. Whether Congress has even enacted a statute in the first place, because that's effectively what's going on when you determine whether a treaty is self-executing. And I'm wondering how that might arguably be non-jurisdictional. Because even if there's no valid cause of action, which is what the question of self-execution goes to, whether or not there is operative law, there's still jurisdiction for this court to review that question, even if the answer is no, under 28 U.S.C. 1331. And so this court can still, has jurisdiction to hear that question, even if ultimately they decide that the treaty is non-jurisdictional. I think that's right. So I think it's definitely true that courts always have jurisdiction to determine whether they have jurisdiction. But that still doesn't tell me whether the question that we're asking about is in fact jurisdictional, because even in a situation in which there's something that's concededly jurisdictional, like the diversity statute or federal question jurisdiction, we definitely have jurisdiction to decide whether we have that jurisdiction. But then the question here is whether the thing that we're trying to decide is itself a jurisdictional requirement that we're required to address. And so the only case that we found that speaks directly to this question is Yogi. Okay. There's also the Bell Supreme Court case and John Doe case in this circuit, but they're not talking about treaties. Right. But they stand for the proposition that even if there's no valid cause of action, that's separate from a jurisdictional question. So you're saying that the question of self-execution is tantamount, is sufficiently similar to the question of whether there's a valid cause of action that they both—and we know that a valid cause of action question is non-jurisdictional, and so we should conclude that the self-execution question is also non-jurisdictional. That's correct, Your Honor. And their self-execution is slightly separate from the cause of action question in that here the cause of action comes from the APA, but the APA relies on other law, and so here the treaty is the other law. But Mr. Sluss does have a valid cause of action under the APA. And so it's important that the court reverse the district court's decision that there was no manageable standard, however, because the mandatory language in the treaty provision does provide a manageable standard, and mock mining makes that clear. This court can look to see whether or not the government did, in fact, consider Mr. Sluss's best interests, and in the record below, the government never argued that it had. It only argued that this decision was fully committed to agency discretion. But the mandatory language binds the United States to documenting that it made a good-faith, individualized, and comprehensive consideration of whether transfer would be in the prisoner's best interest. That's reading some more words into it than the treaty itself says. So what it says is you have to bear in mind, and why is it not borne in mind when the agency said, at least in response to reconsideration, it has the sentences on page 87 to 88 of the record where it takes into account the hardships and reaches the conclusion that these hardships are inapplicable to an inmate who has resided in the United States for a lengthy period of time with the intention to remain in this country, and whose immediate family members are living there. Or living here, rather, I'm sorry. So isn't that, at least bearing in mind best interests in the rehabilitation sense in which that language is used in this context? Yes, Your Honor, but the government never argued that that's what it was doing in that instance. And in the case below, the district court held that there was no judicial review whatsoever. So if this court agrees that there's no judicial review, the government wouldn't have to make any such consideration. They could just automatically deny all transfer applications from Canadian prisoners, and this court would have no ability to look and confirm whether or not best interests were considered. So it's important that, at the very least, the fact that this question is judicially reviewable be decided. Canada could complain to the United States, could it not? That's correct, Your Honor. But the language of the treaty confers indivisible rights on Mr. Sluss and the Canadian prisoners held here, because it's, again, mandatory language that's protecting individuals. And Asakura says that when it recognizes that this court is lenient in recognizing individual rights in treaty provisions. This is true in the extradition context where prisoners are able to sue under extradition treaties, even though those treaties don't expressly say that they have individual rights or even provide a cause of action. And then similarly, courts are more favorable in finding individual rights in bilateral treaties as the one here, because the parties are able to better negotiate specific terms as to what they want done. And here, this provision, Section 6, is the only provision that serves to accomplish the underlying purpose of the treaty, which is the social rehabilitation of the prisoner. So if Mr. Sluss's best interests weren't considered as part of his transfer decision-making process, then his rights under the treaty were not recognized. But just going back to the language, the language says that the decision-making authority shall bear in mind all factors bearing upon the probability that transfer will be in the best interest of the offender. Now, you're saying that that means that the decision, the ultimate decision, has to be in the best interest of the offender. But, I mean, I can tell my children that you should bear in mind that eating all of your vegetables on your, you know, with your dinner here is in your best interest and is healthy for you. And, you know, my toddler could say, but I don't like peas. And, you know, eat everything but the peas that are on his plate. Hasn't he, you know, perhaps borne in mind what I've told him? But nonetheless, he's complied with my directive? That's correct, Your Honor. And so the standard that we ask for doesn't ask that the ultimate decision be directed by a determination of whether or not transfer was in the prisoner's best interests. And the government has the discretion to even find that the decision was, the transfer would be in the prisoner's best interests, and then articulate a reason as to why other reasons overcome the prisoner's best interests. But at the very least, the treaty requires the government to consider the best interests. And this has meaning and weight because it's not an intuitive consideration. And normally when the government is deciding whether or not to transfer prisoners, they're thinking about their own interests as a state. But why wasn't that done here? What's your argument as to why, if there's a requirement, a judicial enforcement requirement, to consider slash bear in mind best interests, what's the argument as to why that wasn't done here given what the determination on reconsideration said at 87-88? So we can't fully know whether or not it was done here because the full administrative record was never before the district court, and the government never argued that it had considered best interests. Why does it have to say, I considered best interests, when the determination itself says here are some interests that we considered? Because at the time that the government was making its transfer decision, I see my time has expired. Can I answer the question? At the time the government was making its transfer decision, it had to be believing that it was complying with the treaty. And so it had to consider best interests using the factors that it determines go to best interests, but it still had to make that consideration. And that's not clear from the record below. And so that's also a piece of why the full administrative record needed to be before the district court, before it could make a decision that best interests had indeed been considered. All right. Why don't we hear from Appley, and we'll give you a couple of minutes on rebuttal. Thank you. Good morning. May it please the Court. I am Jane Lyons. I'm an assistant United States attorney, and I'm here today in place of my colleague, Johnny Walker, who I think you were expecting. Mr. Walker's wife, Happily, went into labor early, early this morning, and so I am here today to present an argument on behalf of the Department of Justice. Mr. Sluss, a dual citizen of Canada and the United States, lacks a judicially enforceable right under the 1977 treaty between Canada and the United States for the execution of penal sentences. There are several reasons for this. First, and I think I'll address them in the analytically, perhaps, ideal way, the treaty is not self-executing either in whole or in part. The treaty also does not provide for a privately enforced right, and it doesn't contemplate, it doesn't contain any clear enough law necessary to override the presumption that treaties do not create privately enforceable rights for their, perhaps, beneficiaries. In this context, a prisoner who requests transfer to another country. I was going to ask Mr. Wright, it may be unfair to ask you, this whole notion about individual provisions of a treaty being self-executing as opposed to the entire treaty, that is an argument that's made as to Article III, Section 6. Do you have any thoughts about that? I've read all the cases that were cited, and basically all that says anything is the restatement's third. Right, which I didn't find particularly helpful either. But here's what I would say about that. In general, treaties are agreements between countries, and the strong presumption is that in the absence of language that makes it very clear that they are to be immediately imported and to become effective, enforceable domestic law, in the absence of that, they are presumed to be not self-executing. We have, beyond that, we have many indications here in this case that the parties did not intend that to happen. So it's sort of a clear, clear language. It would need to be some very clear language, and there's no language identified here by amicus to support that kind of argument. But on the question that Judge Rogers started with, which is whether we do it on a provision-by-provision basis or as an all-or-nothing proposition with respect to an agreement as a whole, why is the restatement confusing? Because the comment says some provisions of an international agreement may be self-executing and others non-self-executing. I think it's possible. I think it's possible. I don't think it clarifies sufficiently, from my way of thinking at least, when that is. But what I do know for sure is that in this case, there's nothing in the text of the treaty and there's nothing in the behavior of the parties who negotiated it or the legislative Senate folks who commented on it said it was not self-executing. We have all of those indications without any indication that there are exceptions for small, for parts. So there's nothing in this case that favors a section-by-section. It could be that all the statements that were pointed out in your brief are statements that have to do with the parts that are non-self-executing because there are parts in the treaty that specifically contemplate the need for legislation. There are provisions that do that. There are. I would say that the parts of the treaty that say they need legislation, I mean, Article III, Paragraph 9, specifically says the signing states must establish by legislation or regulation the procedures, right? So that contemplates that something must happen before the treaty becomes effective. As to that requirement, definitely. I think it would be very hard to say that that's self-executing because it specifically contemplates the need for legislation. There's not that kind of statement with respect to the provision here. It's, yes, but for that provision to have any effect or implementation at all, the first thing has to happen. So I think maybe it's a, it would be a lot to presume here based on this language that doesn't differentiate anywhere that that provision could have become automatically part of domestic, finding domestic law. And even if you could get there, even if you could, the next step is to go to whether the provision creates a judicially enforceable private right. And we think the law is very clear there that it does not. Can I just ask you, what's the government's position on the threshold question of self-executing since you raised it? As I understand it, that argument wasn't made in the district court. It was made, it was not perhaps drawn out the same way we emphasized it in our appellate brief, Your Honor. We cited Medellin and argued that the treaty isn't privately enforceable, and this court in its Committee of Concerned Citizens living in Nicaragua versus Reagan case in 1988 recognized that this question is tied up, part of the larger question of whether the clause is self-executing. So these are really two parts of the same issue is what I would say. So I don't think this is a new issue raised for the first time on appeal. Right. Well, as you yourself set out the argument in logical sequence at the outset, you drew a distinction between these two because you said self-executing and then privately enforceable, right? Yes. There's a reason for that. Yeah. And I'm just seizing on that and saying that suppose that we don't think that the self-executing part of that was flagged below, then in order for us to resolve the question, in order for us to be compelled to decide whether self-execution exists with respect to this provision, we'd have to conclude that self-executing is jurisdictional. That would be correct. And is it the government's view that the question of self-execution is a jurisdictional one? It has been our view that it is not a jurisdictional question. It's your view that it's not jurisdictional? It's not. Okay. So in your view, you're making the self-execution argument, but we don't have to address it if we think it wasn't flagged in the district court? Yes. Of course, as counsel correctly recognized, you have the discretion to do so and we think you should do so. It's an important issue. Okay. So what about Judge Srinivasan's earlier questions to Amicus, in terms of the reliance on 1331 only gets you so far? If I were going to lose this case with you concluding that you lacked jurisdiction, that would be, I acknowledge Judge Srinivasan has a very logical point about that. That's not the way we have presented the issue. Perhaps the important point for focus here is that holding the government to its commitment, as Amicus counsel started out by talking about, is the function in the realm of international treaties of international relations. It's not the function of private U.S. citizens in courts, in civilian courts to handle. There's a presumption that even those benefiting from treaties don't have generally private rights that can be vindicated in the fashion that Mr. Sluss is trying to do here. And that presumption is not overcome in this case. The treaty doesn't confer a right on him. That's one thing that was specifically acknowledged. As to Article III, Section 6? Yes, as to Article III, Section 6, which does not, I looked for what's the opposite of this. This is not a case we cited in our brief, but I was trying to understand this. The opposite might be Section 7. Section 7. In any event. Let me not address that. Right, okay. Let me just not address that, please. I was going to suggest a look at McKesson Corporation versus Iran, which is a case involving a treaty of amity between the United States and Iran. And that helped me understand better. By the way, the site for that case is 539F3rd, and the part I'm pointing to is at page 489. And this treaty, while it was, I believe, self-executing, the court found there was no private right because it doesn't say there was a private right to be enforced in a court. There's much more language that would have to be in this treaty for you to conclude that there was a private, a judicially enforceable private right here for Mr. Sluss. So it's clear from, that the presumption is not overcome by the text of the statute. It's not overcome by the intent of the executive branch and the Senate in considering and negotiating and then ratifying and implementing the treaty. And I think one other thing that occurred to me, and this is just something that occurred to me in preparing for the argument, here the treaty was negotiated and then the legislation was passed. And the legislation was passed without any requirement that the designated official here, the attorney general, bear in mind all factors bearing upon the probability that transfer will be in the best interest of the offender. And just as a general matter, ordinarily treaty obligations can be overridden by subsequent legislation that is inconsistent. So that's one more, that's pretty well established in that committee of citizens living in Nicaragua case in 1988. So here- So even Canada could not complain? Canada can always complain, Your Honor. Well, can always complain. Sure. But without any basis in the treaty to rely on. Well, I think they would have a basis in the treaty to rely on. But the response would be, well, we passed the Transfer Act. Right. And that would be subject to the diplomatic functions of the government to decide whether and how to react to that. It's not a right Mr. Sluss- Because I gather the way the Transfer Act has been used, it is sort of the, I don't want to say this is a technical legal term, but the implementing legislation for numerous treaties. Yes. After the Mexico and Canada treaties were implemented through this particular piece of legislation, the Transfer of Offenders to and from Foreign Countries Act, catchy title. In other words- There are many other countries like the United Kingdom and others have- No, but there are many other treaties where the Transfer Act has provisions that could sort of provide the administrative process. Right. And those countries might be in a better position to say- And this doesn't say, or Congress didn't say we're enacting this for the purpose of implementing the U.S.-Canadian bilateral treaty. So it's sort of interesting. We won't get to it in this case, but it's sort of an interesting notion about what these treaties really mean. It is interesting. And the other thing that struck me in reviewing it is how fast it went from treaty negotiation to legislation passed to legislation signed. The 70s were wonderful. It's been in negotiation for many years. It's been in negotiations for a while, but once it got going it happened fast. I'm not understanding why the Transfer Act is inconsistent with- Because it does not contain the standard from the statute. It doesn't import it. So it doesn't require the Attorney General to consider anything about anybody's best interests at all. And that's why this Court held in Bagley that it is unreviewable, committed to agency discretion, the transfer decision. Right, but if a particular treaty says that there's something that has- Let's just suppose that the treaty makes unbelievably clear that this is something that has to be considered, and that this is something that has to be considered in a way that can be vindicated in a court. Then it's not clear to me why that would be inconsistent with the Transfer Act, because what the Transfer Act says is that the AG has authority to transfer offenders, but it doesn't say that it has the authority to transfer offenders regardless of anything contrary. Has carte blanche authority to transfer regardless of anything contrary in a treaty? It could be that you have that authority to transfer unless a treaty channels that authority in a particular way by requiring you to do certain things. And then the exercise of that authority is subject to whatever a treaty specifies. Right. If the statute contained all of those words, that would be interesting, but what we have here is a statute that is silent with regard to- No, but I mean the point is the Attorney General can transfer, but will Canada accept? Yeah. So, and Canada says, well, we'll accept provided you bear it born in mind. Right. And have yourself. Right. But doesn't Bagley- I mean, Bagley only gets you so far because Bagley, we said that neither the act nor the treaty sets out particularized standards or criteria. And we know what the act says, and the treaty, all that it said was that the, I guess, the sending authority has to agree to the transfer. So there was no language about shall take bear in mind, et cetera. So I don't think that, I mean, Bagley wasn't based on some notion that the statute overrode what was in the treaty. The statute just didn't say anything more than what was in the treaty. And the statute, you know, then was theoretically implementing not just this, not just that treaty, which was the European Convention on the Transfer of Sentenced Persons. But, you know, the amicus theory, impellus theory is that it was perhaps also implementing this other treaty. So I don't see how Bagley gets you over the finish line. Well, okay, assuming we got all the way through to the APA standard and the court was looking to the treaty standard as the one for meaningful review, our argument is, well, our argument, of course, is that you shouldn't get there in the first place. Bagley, I noticed in reading it, it was decided on a motion for summary reversal, interestingly. So I doubt the arguments were terribly well-developed in the way that they have been here. I'd point that out. You haven't seen some of these motions. I know they have a word limit that's pretty severe, Your Honor. I've spent time cutting mine. But to address your question, Judge Wilkins, I mean, we know that the courts look to the nature of the decision, the language, and the structure of whatever it's looking to. So if you're going to look to the statute, I mean the treaty, I'm sorry, the treaty, I still think Bagley correctly recognizes that the treaty is a broad grant of discretionary authority. And perhaps to go back to your hypothetical with your toddler, if you look at your toddler at the end of the meal and say, I see you didn't eat your peas, son. And he says, well, I bore your advice in mind, Dad. I don't think you feel any better. But the nature of the decision is a discretionary one. The idea that this is – I think that goes to – so that gets us to the last step of the inquiry. So let's assume that the government doesn't prevail until we've gotten to the point where we're talking about the application of the standard. Let's assume that the standard actually is judicially enforceable, at least that it sets forth a judicially manageable standard in some respects. So what's wrong with the following? Under mock mining has a somewhat – you're going to have an argument about why that's different. But mock mining has a somewhat analogous standard that says shall endeavor for the EEOC. And what the Supreme Court did is to say we have a normal presumption that says we try to find judicial enforceability when we can. And we're going to construe this language shall endeavor to be judicially enforceable. And we're just going to construe it in such a way that the agency has a lot of discretion. So it's not going to be burdensome for the agency to satisfy it, but it's also not the case that it's not judicially enforceable at all. We're going to have a pretty constrained inquiry into whether the EEOC complied with the requirement that it endeavor to do what the statute contemplates. So here, by parallel reasoning, we could say this statute requires that best interests be borne in mind. That's a pretty narrow requirement. It's just that best interests have to be borne in mind. It's not to say that it wasn't done here. Maybe there's a really good argument that it was done here given what's at JA 87 and 88. But at least it's judicially enforceable insofar as it requires that best interests just be borne in mind. All that we have to conclude is that the government, in fact, took account of best interests. It could disagree with what the applicant says is the best interest. It could certainly disagree with what the applicant says about how those best interests should weigh at the end of the day. But it's just a checkoff requirement that just says you at least have to consider best interests, and you can't entirely exclude them from the analysis. So to distinguish on a couple levels, one is to import something from the treaty as opposed to a statute is an order of magnitude of difference that I think matters here, but we talked about that. Mining is a different situation because it required the EEOC to endeavor to basically try to work things out with the employer before it initiated an enforcement action. I can't remember the words, like conciliate and confer and whatever. There are three words, three verbs. And so action could be more easily measured and identified and, you know, observed, whereas a requirement that something be borne in mind, I mean, that's not a manageable standard because it's very hard to look behind the decision-maker, into the decision-maker's head in any case. And certainly here, I would agree that at the end of the day, what's at JA 87 and 88 reflects that considerations of the best interests, perhaps not as Mr. Sluss would have argued, would have liked, were done here. So there has to be – so I agree with you, you can't step into somebody's mind, but that would be equally true even if you were just enforcing this diplomatically because you could – Canada and the U.S., if someone – if diplomats from each country said, did you bear that in mind, well, you'll never know because I – you can't read my mind. But if it's just what it requires is just some manifestation of the fact that it was borne in mind, that's a very minimal requirement. And that manifestation, you would argue, I think, with some force was definitely met here because if you look at the decisional document, the rehabilitation interests were definitely borne in mind. Right, exactly the things that the treaty was designed to address, which is, you know, the rehabilitative purposes. He understands the language, he's not separated from his family, so all the things that's within the – you know, what the spirit of the treaty encompasses were certainly considered here. But I think the more important point in your question there is that that is a matter for Canada and the United States to resolve diplomatically, not for a court to recognize through a private – judicially enforceable private right to the beneficiary of a treaty. That's all. All right. Thank you. If it's not already clear, please affirm. Thank you. All right, amicus. A few points on rebuttal, Your Honours. This court should review – in finding a manageable standard, this court should ask the district court to have the full administrative record before it. That is how courts under the APA review final decisions made by agencies. The court doesn't have to get into the heads of the decision makers. The APA requires there be a record of how the agency made its decision. And it's clear in this case that the full administrative record was not before the district court at the time the decision was made. Mr. Sluss has made a motion for supplemental evidence on appeal and has provided further documents from the administrative record that he has received in separate FOIA litigation against the IPTU. So that demonstrates that there was information that goes to how the agency made this decision before – that was never before the district court. The implementing legislation referred to goes to the authority of the executive to make the transfer decision. And the government is correct in that the implementing legislation was passed before the treaty was ratified because otherwise the government would have no authority to receive prisoners from Canada or Mexico and hold them under other countries' sentences. But once that authority was given to the executive, Section 6 constrains the authority of the executive in their decision-making process. And because – and that did not need implementing legislation. The parties bound themselves to the agreement at the time they ratified the treaty. Further, there's no presumption against self-execution. And in fact, Medellin expressed that it rejected a requirement for clear language indicating self-execution. So if there are no further questions, for these reasons, we ask this court to reverse and remand with the full administrative record. Thank you. And the court wants to express its appreciation to you for the assistance you've provided. Thank you.
judges: Rogers, Srinivasan, Wilkins